**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

SAN DIEGO POLICE OFFICERS'
ASSOCIATION, on behalf of itself
and on behalf of all of its
members,
       *Plaintiff-Appellant,*

     v.

SAN DIEGO CITY EMPLOYEES'
RETIREMENT SYSTEM; CITY OF SAN
DIEGO; SCOTT PETERS; JIM
MADAFFER; RALPH INZUNZA; TONI
ATKINS; TONY YOUNG; BRIAN
MAIENSCHEIN; DONNA FRYE;
MICHAEL ZUCCHET; CATHY LEXIN;
MARY VATTIMO; TERRI WEBSTER;
ED RYAN; P. LAMONT EWELL;
MICHAEL UBERUARGA; BRUCE
HERRING,
       *Defendants-Appellees.*

No. 07-56004

D.C. No.
CV-05-01581-H
Southern District of
California,
San Diego

OPINION

SAN DIEGO POLICE OFFICERS'
ASSOCIATION, on behalf of itself
and on behalf of all of its
members,
                    *Plaintiff-Appellant,*

                    v.

SAN DIEGO CITY EMPLOYEES'
RETIREMENT SYSTEM; CITY OF SAN
DIEGO; SCOTT PETERS; JIM
MADAFFER;RALPH INZUNZA; TONI
ATKINS; TONY YOUNG; BRIAN
MAIENSCHEIN; DONNA FRYE;
MICHAEL ZUCCHET; CATHY LEXIN;
MARY VATTIMO; TERRI WEBSTER;
ED RYAN; P. LAMONT EWELL;
MICHAEL UBERUARGA; BRUCE
HERRING,
                    *Defendants-Appellees.*

No. 07-56483

D.C. No.
CV-05-01581-MLH
Southern District of
California,
San Diego

SAN DIEGO POLICE OFFICERS'
ASSOCIATION, on behalf of itself
and on behalf of all of its
members,
                    *Plaintiff-Appellee,*

        v.

SAN DIEGO CITY EMPLOYEES'
RETIREMENT SYSTEM,
                         *Defendant,*

SCOTT PETERS; JIM MADAFFER;
RALPH INZUNZA; TONI ATKINS;
TONY YOUNG; BRIAN MAIENSCHEIN;
DONNA FRYE; MICHAEL ZUCCHET;
CATHY LEXIN; MARY VATTIMO;
TERRI WEBSTER; ED RYAN; P.
LAMONT EWELL; MICHAEL
UBERUARGA; BRUCE HERRING,
                        *Defendants,*

        and

CITY OF SAN DIEGO,
              *Defendant-Appellant.*

No. 07-56512

D.C. No.
CV-05-01581-MLH
Southern District of
California,
San Diego

Appeal from the United States District Court
for the Southern District of California
Marilyn L. Huff, United States District Court Judge

Argued and Submitted
October 23, 2008—Pasadena, California

Filed June 10, 2009

Before: Consuelo M. Callahan and Sandra S. Ikuta,
Circuit Judges, and Milton I. Shadur,* Senior District
Judge.

Opinion by Judge Shadur

---

*The Honorable Milton I. Shadur, Senior United States District Judge
for the Northern District of Illinois, sitting by designation.

## COUNSEL

Christopher D. Nissen, Susan M. Wilson and M. Alim Malik, Law Offices of Jackson, DeMarco, Tidus, Petersen & Peckenpaugh, Irvine, California, for San Diego Police Officers' Association, plaintiff-appellant/cross-appellee.

Peter H. Benzian and Colleen C. Smith, Law Offices of Latham & Watkins LLP, San Diego, California, for City of San Diego, Scott Peters, Jim Madaffer, Ralph Inzunza, Toni Atkins, Tony Young, Brian Maienschein, Donna Frye, Michael Zucchet, Cathy Lexin, Mary Vattimo, Terri Webster, Ed Ryan, P. Lamont Ewell, Michael Uberuaga and Bruce Herring, defendants-appellees/cross-appellants.

Matthew M. Mahoney, Law Offices of Seltzer Caplan McMahon Vitek, San Diego, California, for San Diego City Employees' Retirement System, defendants-appellees/cross-appellants.

## OPINION

SHADUR, Senior District Judge:

San Diego Police Officers' Association ("Association") appeals the district court's orders granting summary judgment to the City of San Diego ("City"), San Diego City Employees' Retirement System ("Retirement System") and various individuals ("Individual Defendants")[1] (collectively "Appellees") on Association's constitutional claims. In addition, Association and Appellees cross-appeal from the district court's final order addressing the possible award of attorneys' fees.

Association's lawsuit charged that (1) Appellees' involvement in approving and enacting a city ordinance that reduced City's contributions to the employees' retirement fund violated Association's contractual right to an actuarially sound pension system and (2) City's imposition of its last, best and final offer ("Final Offer") after the breakdown of 2005 labor negotiations between City and Association violated the latter's vested contractual rights. After extensive briefing by the parties, the district court found that none of the alleged actions affected Association's constitutionally protected rights. It therefore granted summary judgment to Appellees and relatedly entered a final order in which it awarded costs to Appellees as prevailing parties but denied an award of attorneys' fees to any party. We affirm in all respects except for the attorneys' fees issue, which we remand to the district court.

---

[1]Individual Defendants include (1) current or former City Council members Scott Peters, Jim Madaffer, Ralph Inzunza, Toni Atkins, Tony Young, Brian Maienshein, Donna Frye and Michael Zucchet, (2) former Retirement System Board of Trustees members Cathy Lexin, Mary Vattimo, Terri Webster, Ed Ryan and Bruce Herring and (3) former City Managers P. Lamont Ewell and Michael Uberuaga. City Attorney Michael Aguirre was originally named as a defendant in the case, but on June 5, 2008 we granted Association's and Aguirre's joint motion to dismiss him from the appeals.

## *Background*

### Alleged Underfunding of San Diego's City Pension System

Pursuant to the San Diego City Charter, the San Diego City Council is empowered to set benefits and establish a retirement plan for its employees. That City Charter vests the Board of the Retirement System ("Board") with the power to determine eligibility for receipt of retirement benefits under the system, which establishes a defined benefit pension plan. In that role the Board administers the retirement system and performs various functions related to the plan, including the calculation of annual employer and employee contributions, the management and investment of the plan's funds and the distribution of pension benefits to retired City employees. Membership in the Retirement System is compulsory and a condition of employment for City employees. Retirement benefits under the plan are funded by contributions from both the pension system's members and City, which contributions are in turn invested for the benefit of the Retirement System members. Before 1996 City's annual contribution to the Retirement System was determined by a Retirement System actuary, who set the contribution rate based on actuarial calculations. In its collective bargaining agreement City agreed to subsidize or "pick up" a portion of the employee contribution, in addition to making its employer contribution. Determination of the Retirement System's funded ratio is based upon the current value of the system's assets compared to its future liabilities as calculated by the actuary—any difference between the two constitutes the "unfunded accrued actuarial liability."

In 1996 the Board and City Council approved an Employer Contribution Rate Stabilization Plan, known as "MP1," that changed the way in which City's employer contributions were calculated. According to the terms of MP1, City's annual contribution to the Retirement System was set at an agreed-upon rate that was lower than its actuarially determined contribu-

tion rate. In the event the Retirement System's funded ratio fell below a 82.3% "trigger percentage," MP1 required City's contribution rate to be "increased on July 1 of the year following the date of the actuarial valuation in which the shortfall in funded ratio is calculated . . . to restore a funded ratio" back to the 82.3% trigger level.[2]

As a result of declining financial conditions and losses to the Retirement System fund in 2001, the system's funded ratio dropped and began to approach the 82.3% trigger percentage. To avoid having to pay the full amount to restore the funded ratio to the trigger level by the following year, City sought relief from its contribution obligations as part of the 2002 labor negotiations between City and Association. It sought to condition any increase in benefits and compensation to Association's members on the Board's approval of a proposal easing City's contribution burden under MP1. That new proposal, aptly named MP2, retained the 82.3% trigger percentage but extended City's fixed contribution rate for another five years, during which time City would increase its payment 1% per year. Despite opposition from Association's representative on the Board, MP2 was approved by the Board on November 15, 2002, and three days later City Council adopted an ordinance specifying that City's contributions were to be made at the agreed-upon rate.

**2005 Labor Negotiations Between City and Association**

In early 2005 City undertook labor negotiations with Association and three other unions, all of whose collective bargaining agreements, each known as a Memorandum of Understanding ("MOU"), were scheduled to expire on June 30, 2005. Acting through its outside labor relations attorney,

---

[2]Although Association originally brought claims arising out of the enactment of MP1, those claims were dismissed as barred by the relevant statute of limitations. Hence the lawfulness of that earlier arrangement is not at issue in this appeal.

City engaged in bargaining sessions with the unions over several months with an eye toward a May 16, 2005 deadline for reaching an agreement. Given its financial condition and the pension funding crisis, City's primary goal during negotiations was to obtain financial concessions from the unions to achieve recurring budgetary savings. To that end City originally proposed two options to the unions: a reduction in members' salaries or a reduction of City's subsidy, or "pickup," of the employees' pension contribution.

During the negotiations City discussed different proposals with each of the unions, and the agreements ultimately reached between City and the unions other than Association contained variations as to each union. For example, because some of the unions' members participate in the Deferred Retirement Option Program ("DROP")[3] and therefore do not make pension contributions subject to the reduction in pickup, City's proposals to some of the unions, including Association, contained a salary reduction for DROP employees in lieu of a reduction in pickup.

Bargaining sessions between City and Association were unsuccessful. After their last formal bargaining session on May 5, 2005, City and Association met again on May 11, at which time Association requested a final offer from City to present to its members. Despite its expression of reluctance, City presented a Final Offer containing a one year proposal

---

[3]DROP allows an employee to continue working beyond the age set for retirement and provides an alternative form of pension benefit accrual under which an employee's final pension benefits under the defined benefit plan are determined and calculated as of the date the employee enters DROP. In lieu of having continued compensation and additional years of service taken into account for the defined benefit plan, DROP members' pension benefits are deposited to a DROP account, to which each of the employee and City contributes a percentage of the employee's base salary. That DROP account earns interest and is paid to the employee, in addition to its previously defined benefits, once the employee leaves City employment.

with a 3.2% reduction in the amount of the employees' pickup and an equivalent reduction in the salary of DROP employees, as well as certain changes in the service eligibility requirements for retiree health benefits. On the following day Association formally declared an impasse and requested a formal hearing before City Council. Then on May 16 City Council held an impasse hearing and voted to impose the terms of the Final Offer on Association. On May 17 City voted to enact the Salary Ordinance for Fiscal Year 2005-06, which included the terms of City's Final Offer.

## Procedural History of This Litigation

On August 9, 2005 Association filed its Complaint against Appellees, asserting various state law claims as well as federal claims under 42 U.S.C. § 1983.[4] On March 21, 2006 Association filed its Third Amended Complaint. On January 3, 2007 Retirement System filed a motion for partial summary judgment, which was then joined by City and Individual Defendants. On February 12, 2007 Association filed a motion for summary judgment asserting statute of limitations defenses, a motion for summary adjudication related to the discovery of Association's injuries and a motion for summary judgment on asserted affirmative defenses. Individual Defendants also filed various motions for summary judgment and partial summary judgment.

After permitting supplemental briefing by Association and extensive argument on the motions for summary judgment, the district court entered a May 18, 2007 order on several of the motions. It granted summary judgment to Individual Defendants on various grounds and granted partial summary judgment to City and the Retirement System on Association's federal constitutional claims arising out of the 2005 labor negotiations, but it declined to address Association's claim as

---

[4]All further references to Title 42's provisions will simply take the form "Section—."

to pension underfunding. Instead the court requested additional briefing on that claim and held further argument on the issue on June 25, 2007. Following that argument the court granted summary judgment on June 26, 2007 to City and the Retirement System on all of Association's remaining federal claims and declined to exercise supplemental jurisdiction over Association's state law claims. On July 2, 2007 Association timely filed a notice of appeal from the district court's May 18 and June 26 summary judgment orders.

On July 12, 2007, after considering the parties' proposed final judgment orders, the district court entered an order permitting the parties "to submit additional briefing regarding costs" and specifically requested that it be provided with authority as to the appropriate apportionment of costs in light of its declination to exercise supplemental jurisdiction over Association's remaining state law claims. In its supplemental brief that followed, Association argued that it was entitled to an award of costs and attorneys' fees. Defendants, on the other hand, addressed only the issue of costs and specifically declined to address Association's arguments regarding the parties' entitlement to attorneys' fees pursuant to Section 1988, noting that the district court had not requested briefing on the right to attorneys' fees and asserting that Fed. R. Civ. P. ("Rule") 54(d)(2) allows just 14 days after entry of judgment to submit any motion in pursuit of such fees.

On August 24, 2007 the district court entered an order finding that defendants as prevailing parties were entitled to all of their recoverable costs incurred during the litigation but that neither side was entitled to recover its attorneys' fees. Final judgment in favor of defendants was entered that same day. Both Association and defendants filed timely notices of appeal of the district court's August 24 order regarding costs.

### *Association's Appeal*

## Standard of Review

We review de novo the district court's order granting summary judgment (*Buono v. Norton*, 371 F.3d 543, 545 (9th Cir. 2004)). In doing so we are governed by the same principles as the district court: whether, with the evidence viewed in the light most favorable to the non-moving party, there are no genuine issues of material fact, so that the moving party is entitled to a judgment as a matter of law (*Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004)).

## Enactment of MP2

Association claims that its members had a contractual right to an actuarially sound pension plan, so that the enactment of MP2 and the resulting underfunding of the pension fund was an impermissible impairment of that contractual right. Hence Association brought a Contracts Clause claim, a Takings Clause claim and a conspiracy claim on that premise. In response Appellees contend that there is no federal constitutional right under the Contracts Clause to an actuarially sound pension system. They also argue that whether or not that is so, the district court's grant of summary judgment as to Association's underfunding claims should be affirmed because those claims are precluded by *McGuigan v. City of San Diego*, No. D050291, 2008 WL 4358551 (Cal. Ct. App. Sept. 25, 2008). Because we find *McGuigan* to be dispositive of Association's underfunding claims, we eschew consideration of the litigants' constitutional dispute.

City and Individual Defendants maintain that the release terms contained in the settlement and final judgment approved in *McGuigan* bar Association's current claims against them. Although they made the same argument in the district court, that court's opinion correctly found that the settlement agreement and final decision in *McGuigan* were not final for claim

preclusion purposes[5] because they were then on appeal. City and Individual Defendants maintained in their brief before us that although the *McGuigan* action might ultimately preclude recovery by Association, the agreement and judgment there were not yet final for that purpose. Instead they claimed that the January 16, 2003 judgment in *Gleason v. San Diego City Employees' Retirement System*, No. G1C803779 (Cal. Super. Ct.) also precluded Association's present action.[6]

After the parties had submitted their appellate briefs but before we heard oral argument, the California Court of Appeal affirmed the settlement agreement and judgment in *McGuigan*. After oral argument we requested and the parties submitted supplemental briefing on the effect of the Court of Appeal's *McGuigan* decision. Association did not file a petition for review by the California Supreme Court within the prescribed time limits, so that the *McGuigan* judgment became final on November 25, 2008. We now turn to the effect of that final judgment on Association's claims.

For that purpose we must follow California's preclusion rules (*Noel v. Hall*, 341 F.3d 1148, 1166 (9th Cir. 2003)). Under California's claim preclusion doctrine "a valid, final judgment on the merits precludes parties or their privies from

---

[5]Because the term "res judicata" has often been used to denote both preclusion doctrines (both what were long called "collateral estoppel" and "res judicata," the latter in a more restricted sense), this opinion will follow the lead of the Supreme Court in *Migra v. Warren Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 77 n.1 (1984) by using the more precise term "claim preclusion."

[6]In *Gleason* former City employees with vested contractual rights sued City, the Retirement System and a number of individual defendants, alleging various violations arising from the underfunding of the Retirement System. In July 2004 the *Gleason* lawsuit was resolved by a settlement in which City agreed to make specific annual payments to the Retirement System between 2006 and 2008, to pay actuarially determined contribution rates in 2006 through 2008 and to continue to make actuarially determined contributions beyond 2008.

relitigating the same 'cause of action' in a subsequent suit" (*Le Parc Cmty. Ass'n v. Workers' Comp. Appeals Bd.*, 2 Cal. Rptr. 3d 408, 415 (Cal. Ct. App. 2003)). Thus three requirements have to be met: (1) the second lawsuit must involve the same "cause of action" as the first one, (2) there must have been a final judgment on the merits in the first lawsuit and (3) the party to be precluded must itself have been a party, or in privity with a party, to that first lawsuit. Because Association itself was a party in *McGuigan* and because that judgment has now become final, the only remaining question is whether this case involves the same "cause of action" as *McGuigan*.

*Le Parc Cmty. Ass'n*, *id*. continues its claim preclusion analysis in these terms:

> California law defines a "cause of action" for purposes of the res judicata doctrine by analyzing the primary right at stake.

That concept "is indivisible: the violation of a single primary right gives rise to but a single cause of action" (*Crowley v. Katleman*, 881 P.2d 1083, 1090 (Cal. 1994)). As *Eichman v. Fotomat Corp.*, 197 Cal. Rptr. 612, 614 (Cal. Ct. App. 1983) further explains:

> [I]f two actions involve the same injury to the plaintiff and the same wrong by the defendant then the same primary right is at stake even if in the second suit the plaintiff pleads different theories of recovery, seeks different forms of relief and/or adds new facts supporting recovery.

But the "primary right" brush cannot be wielded too carelessly (*Branson v. Sun-Diamond Growers of Cal.*, 29 Cal. Rptr. 2d 314, 322 (Cal. Ct. App. 1994)):

> On the other hand, different primary rights may be violated by the same wrongful conduct.

What is critical to the analysis "is the harm suffered; that the same facts are involved in both suits is not conclusive" (*Agarwal v. Johnson*, 603 P.2d 58, 72 (Cal. 1970)).

In McGuigan a retired city employee sued City on a representative basis alleging various violations and theories regarding City's pension underfunding. That lawsuit eventuated in a settlement agreement, binding on Association's members as members of the plaintiff class,[7] which specifies the release terms:

> [E]ach member of the Settlement Class . . . hereby release, discharge and dismiss with prejudice City, from any and all claims or causes of action that arise from the facts alleged in the . . . Those claims are: (a) that City violated former Charter section 143; (b) City violated former Municipal Code section 24.081; (c) that City's past practice of paying an employer contribution less than that recommended by the actuary employed by SDCERS[8] rendered the pension fund actuarially unsound and thereby impaired the beneficiaries' contractual right to an actuarially sound pension fund; (d) for declaratory relief that

---

[7]After the settlement agreement was agreed upon, McGuigan and City obtained approval to amend the complaint. In the amended complaint the class was defined as "All past, present and future San Diego City Employees' Retirement System ('SDCERS') members and beneficiaries, their spouses, children, heirs, successors and assigns, and the representatives of such individuals, including, but not limited to, each of the plaintiffs or claimants in the Pension Underfunding Claims (as defined in the parties' Settlement Agreement and Release (collectively, the 'Settlement Class')," and it included over 18,000 potential members. Because the class is a "non-opt-out" class, as authorized by Rule 23(b)(2), the agreement is binding on Association's members.

[8]Although the litigants also regularly employ that acronym, our preference for descriptive English language definitions rather than an alphabet soup diet has led to our use of the plain-meaning term "Retirement System" instead. So "SDCERS" will be used here only in quotations from other sources.

City underfunded the SDCERS pension system and must pay additional amounts, plus interest, to rectify such underfunding; and (e) for a peremptory writ of mandate directing City to pay SDCERS the amount of City's shortfall in employer contributions from 1996-2006 (collectively the "Pension Underfunding Claims").

In its final judgment the trial court said this as to the release (emphasis added):

The release does not extend to any claims other than the claims or causes of action set forth in the Plaintiffs' Second Amended Complaint, and, specifically, the release does not extend to claims arising out of: (1) City's alleged failure to fund the pick-up portion of the employee retirement contribution, (ii) City's alleged underfunding of retiree health benefits, (iii) any conspiracy by the SDCERS actuary with City to understate City's employer contribution to SDCERS, or (iv) claims not otherwise released or waived by the Settlement Agreement; *provided, however, released claims would include damage claims under 42 U.S.C. section 1983 or any state, federal or common law to the extent that they are based upon the City's failure to pay the amount annually determined by the SDCERS actuary and approved by the SDCERS Board from 1996 to 2006. . .*

Association maintains that language does not release the underfunding claims it has brought in this action. It argues that the *McGuigan* action involved allegations that City failed to fund the retirement system at the fixed rate agreed to in the MP1 and MP2 agreements, while in this action Association contends that the underlying funding system created by MP2 was itself unlawful. City and Individual Defendants, on the other hand, urge that the settlement agreement releases all federal Section 1983 claims arising from the adoption of

MP2, so that all of Association's Section 1983 claims related to the pension underfunding, including its Contracts Clause claim, Takings Clause claim and any conspiracy claim, are precluded.

Association's position is premised on a distinction without a difference. Although its claims in this action literally focus on the enactment of MP2 and the funding levels it created, rather than on the question of City's compliance with those levels, they are nevertheless unquestionably "based upon City's failure to pay the amount annually determined by the SDCERS actuary and approved by the SDCERS Board from 1996 to 2006." Whether that failure is framed in terms of not having funded Retirement System at the rate established by MP2 or in terms of the enactment of MP2 as such, the alleged violation is the same: the level at which payments were made to Retirement System is claimed to have been impermissibly lower than that determined by the Retirement System actuary.

For just those reasons, the claims that Association asserts in this action against City are precluded by the *McGuigan* settlement's release. As to Individual Defendants, the fact that they were not defendants in the first action does not prevent them from asserting the defense of claim preclusion here (*Brinton v. Bankers Pension Servs., Inc.*, 90 Cal. Rptr. 2d 469, 473-74 (Cal. Ct. App. 1999)). Association's claims here allege the same injury to Association (the financial insecurity of Retirement System) and the same wrong by City (the failure to fund Retirement System on an actuarially sound basis) as those asserted in the *McGuigan* action. Because Association's claims against Individual Defendants thus involve the same "cause of action" as those in *McGuigan*, they too are barred by the doctrine of claim preclusion.[9]

[9]Association's claim for monetary relief against Retirement System in connection with the enactment of MP2 was already extinguished by the district court, and Association has not challenged that ruling on appeal.

Without those claims, all that remains is Association's request that we declare there is a federally recognized contractual right to an actuarially sound pension system. But with no live case or controversy before us, there is no call for such declaratory relief (*In re Burrell*, 415 F.3d 994, 998 (9th Cir. 2005)). Hence any of Association's remaining claims as to the enactment of MP2 and its alleged underfunding of the pension system are moot (*id.*).

2005 Labor Negotiations

Association also contends that City's imposition of its Final Offer in the 2005 labor negotiations and its corresponding reductions in employees' DROP salary and City's pickup, as well as modifications to the eligibility requirements for retiree health benefits, impaired vested pension benefits in violation of the Contracts and Takings Clauses. Because the first of those contentions requires a great deal more analysis than the second, we address them in that order.

### 1. Contracts Clause

Under U.S. Const. art. I, § 10, cl. 1, "No State shall . . . pass any . . . Law impairing the Obligation of Contracts." In that respect courts undertake a threshold inquiry to determine whether contract rights have been impaired, first examining "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship" (*Energy Reserves Group, Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411 (1983)). That inquiry includes (1) whether a contract exists as to the specific terms allegedly at issue, (2) whether the law in question impairs an obligation under that contract and (3) whether the discerned impairment can fairly be characterized as substantial (*Gen. Motors Corp. v. Romein,* 503 U.S. 181, 186 (1992); *Robertson v. Kulongoski*, 466 F.3d 1114, 1117 (9th Cir. 2006)). Laws that substantially impair state or local contractual obligations are nevertheless valid if they are "rea-

sonable and necessary to serve an important public purpose" (*U.S. Trust Co. v. N.J.*, 431 U.S. 1, 25 (1977)).

Although federal courts look to state law to determine the existence of a contract, federal rather than state law controls as to whether state or local statutes or ordinances create contractual rights protected by the Contracts Clause (*Nev. Employees' Ass'n v. Keating*, 903 F.2d 1223, 1227 (9th Cir. 1990)). Nevertheless, federal courts do "accord respectful consideration and great weight to the views of the State's highest court" (*Gen. Motors*, 503 U.S. at 187). Under federal law the state's statutory language must evince a clear and unmistakable indication that the legislature intends to bind itself contractually before a state legislative enactment may be deemed a contract for purposes of the Contracts Clause (*Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry.,* 470 U.S. 451, 465-66 (1985); *U.S. Trust Co.*, 431 U.S. at 17-18).

## A. Final Offer's Reduction in DROP Salary Does Not Affect a Protected Contractual Right

Association maintains that DROP members' salaries are vested pension rights entitled to protection under the Contracts Clause. Appellees respond that DROP salaries are a term of active employment rather than contractual rights and, as such, are subject to reduction without running afoul of constitutional rights.

As California courts have noted, "[i]t is well established that public employees have no vested rights to particular levels of compensation and salaries may be modified or reduced by the proper statutory authority" (*Tirapelle v. Davis*, 26 Cal. Rptr. 666, 678 (Cal. Ct. App. 1993)). *Vielehr v. Cal.*, 163 Cal. Rptr. 795, 797 (Cal. Ct. App. 1980) amplifies on that principle:

> [P]ublic employment and the rights, duties, and conditions thereof are creatures of statute, not contract,

and unless and until vested rights to retirement ripen into vested contractual rights, the Legislature may modify conditions of employment without violating vested pension rights which have become protected under the contract clauses of the Constitutions.

So the question is whether a member's DROP salary is considered a term of employment that can be modified without constitutional consequences, or whether it is instead a vested contractual pension right.

Appellees point to extensive evidence establishing that a DROP participant is considered an active employee, subject to all the terms and conditions of active employment. Municipal Code provisions, the DROP manual and the MOU in effect at the time of negotiations all confirm that DROP members are considered as "retired"—a legal fiction—only for purposes of the calculation of pension benefits, while they remain subject to all other terms and conditions of employment, including disciplinary actions up to and including termination. Termination by its very nature would reduce a member's DROP "salary" to zero and is specifically authorized by the terms of the members' MOU.

Instead of trying to show directly that a DROP salary is itself considered a vested pension benefit, Association contends that amounts become vested benefits immediately upon being contributed and credited to a member's participation account. In so doing it attempts to link the two inextricably, claiming that salary reductions impact the value of a member's DROP account by reducing the amounts contributed by both members and City and thereby reducing the return earned by the DROP account.

But that effort is at odds with the established principle that indirect effects on pension entitlements do not convert an otherwise unvested benefit into one that is constitutionally protected (*Vielehr*, 163 Cal. Rptr. at 797; *Miller v. Cal.*, 557 P.2d

970, 974-75 (Cal. 1977)). *Miller*, for example, concluded that a statutory reduction in the mandatory retirement age that in turn caused a reduction in an employee's potential pension benefits did not impact a vested contractual right. Although the court recognized that the plaintiff acquired a vested right to a pension upon his acceptance of public employment, it based its rejection of plaintiff 's position on its holdings that his right to earn increased pension benefits was necessarily contingent on his remaining in state employment and that he had no vested contractual right to continue working for any specific time (*id*. at 975).

In precisely the same way, any contractual rights that Association members have to DROP benefits is contingent upon the salary amounts that they contribute and does not save them from having to establish a vested contractual right in that salary. It is noteworthy that Association's argument, if adopted, would apply equally to salaries earned by active members who are not participants in the DROP program, because those salaries of course also affect the ultimate pension benefits that those employees are entitled to receive. And yet Association does not dispute that an active member's salary is a term of employment, not a vested contractual right subject to constitutional protections.

In sum, we hold that DROP salary is not a vested right subject to the protection of the Contracts Clause. Association's claim based on the reduction of such DROP salary fails as a matter of law.

### B.    Final Offer's Reduction in City's Pickup Amount Also Does Not Affect a Protected Contractual Right

Next Association contends that City's pickup of a portion of its employees' retirement contribution is a vested contractual right, so that the 3.2% reduction of that amount imposed by the Final Offer violated the Contracts Clause. Here again

the relevant inquiry is whether City's pickup is a vested retirement benefit or a salary item subject to modification or reduction.

Association concedes that pickups are a mandatory subject of bargaining, but it nonetheless claims that they are vested retirement benefits such that any reduction must be accompanied by a corresponding benefit. In attempted support of that position Association points to cases dealing with a legislative increase in the employee contribution rate, but that is not the situation here, where the overall employee contribution amount has not been changed—only the employee's payment toward that amount has been affected. To the extent that the courts in *Wisley v. City of San Diego*, 10 Cal. Rptr. 765 (Cal. Ct. App. 1961), and *Allen v. City of Long Beach*, 287 P.2d 765 (Cal. 1955) found a contractual right to the level of the employees' contribution amounts, the recognized right protected only increases in those total amounts, not the share paid by employees.

Rather than citing any direct legal support for its assertion, Association seeks to rely on City's historical practice of negotiating the amount of pickup only in lieu of or in conjunction with salary *increases*. Yet that does not bear on the legal classification of City's pickup amount. Indeed, the very fact that City has historically equated modifications in pickup and salary amounts really confirms that City has treated pickups as a compensation term, not a retirement benefit.[10]

Appellees, on the other hand, offer evidence establishing that City's pickup is considered equivalent to a negotiated salary item by both Association and other California cities. San

---

[10]Association's argument that employee contributions, and thus pickup amounts, are made on a pre-tax basis is equally unavailing. Pickups are by their very nature related to retirement payments. That the tax treatment of those amounts recognizes that fact sheds no light on whether City's contribution is a vested retirement benefit protected by the Contracts Clause.

Diego City Charter art. IX, § 143 (emphasis added) expressly states that "[t]he City shall contribute annually an amount substantially equal to that required of the employees for normal retirement allowances, as certified by the actuary, but shall not be required to contribute in excess of that . . ." In addition, the MOU between Association and City in effect before the 2005 labor negotiations states that in providing for City's pickup amount, "[t]he employee, upon termination, will have no vested right in the amount so contributed by City."

It simply cannot be said that City's pickup is a vested contractual benefit entitled to protection under the Contract Clause. As a result, the Final Offer's reduction in the pickup amount also did not violate any of Association's constitutional rights.

#### C.    Lastly, Final Offer's Modifications to Employee Eligibility Requirements for Retiree Health Benefits Also Do Not Affect a Protected Contractual Right

Association's third and final contention stemming from the 2005 labor negotiations is that the modifications imposed by the Final Offer on employee eligibility requirements for retiree health benefits impaired its vested contractual rights. Those requirements, applicable only to current employees hired before July 1, 2005, established service qualifications of 10 years for a 100% benefit and 5 years for a 50% benefit.

Citing *Thorning v. Hollister Sch. Dist.*, 15 Cal. Rptr. 2d 91 (Cal. Ct. App. 1992) and *Cal. League of City Employee Ass'ns v. Palos Verdes Library Dist.*, 150 Cal. Rptr. 739 (Cal. Ct. App. 1978), Association argues that the district court erroneously characterized the retiree health benefits at issue as longevity-based benefits rather than vested rights. *Cal. League*, *id.* at 741-42 held that certain fringe benefits for long-term employees—a longevity salary increase, increased

vacation time and a paid sabbatical—were vested contractual rights subject to constitutional protection. In determining whether the benefits were "fundamental," the court evaluated "the effect of it in human terms and the importance of it to the individual in the life situation" (*id*. at 741, quoting *Bixby v. Pierno*, 481 P.2d 242, 252 (Cal. 1971)). *Thorning*, 15 Cal. Rptr. 2d at 95-97 found that plaintiffs, retired school district board members, had a vested contractual right to the retiree health benefits expressly granted to them by an official declaration of policy during their term of public office. Using the framework established by *Cal. League*, the court found that the benefits were fundamental and could not be unilaterally terminated (*id*. at 96).

But we find the reasoning in *Cal. League* unpersuasive because the court there did not acknowledge the heavy burden on a plaintiff to "overcome [the] well-founded presumption" (*Robertson*, 466 F.3d at 1118) that a legislative body does not intend to bind itself contractually, nor did it look to the legislative body's intent to create vested rights (*id*. at 1117). Instead we find the analysis in *San Bernardino Pub. Employees Ass'n v. City of Fontana*, 79 Cal. Rptr. 2d 634 (Cal. Ct. App. 1998) far better attuned to the principles that we have articulated in *Robertson*. That California Court of Appeal's decision held that longevity benefits, including pay and leave accrual increases based on longevity, as provided for by MOUs between the city and its bargaining groups, "could not have become permanently and irrevocably vested as a matter of contract law, because the benefits were earned on a year-to-year basis under previous MOU's that expired under their own terms" (*id*. at 639). In the course of its extensive examination of the caselaw as to pension rights and vested retirement benefits, the court (*id*. at 638 (citation omitted)) criticized the *Cal. League* court's analysis:

> The *California League* court's reliance on *Bixby* is misplaced. *Bixby* merely established a rule of judicial review applicable to adjudicatory orders or deci-

sions of public agencies. The case cannot fairly be read as establishing a new measure of substantive rights to be protected under the contract clause.

That inquiry into the legislative intent to create a contract is consistent with our analysis as to the existence of a contract (see *Robertson*, 466 F.3d at 1117-18). Were the recognition of constitutional contract rights to be based on the importance of benefits to individuals rather than on the legislative intent to create such rights, the scope of rights protected by the Contracts Clause would be expanded well beyond the sphere dictated by traditional constitutional jurisprudence. By contrast, as with the benefits at issue in *San Bernardino*, Appellees have presented evidence showing that the retiree medical benefits here were considered a term of employment that could be negotiated through the collective bargaining process. As such, they were longevity-based benefits that continued only insofar as they were renegotiated as part of a new agreement and were not protectible contract rights.

Thus the last of Association's arguments that the imposition of the 2005 Final Offer affected any of its rights under the Contract Clause fails as well. Appellees are entitled to summary judgment on Association's claims premised on that Final Offer.

## 2.   Takings Clause and Conspiracy Claims

Far less discussion is required to dispatch Association's Takings Clause and conspiracy claims arising from the labor negotiations that led to the Final Offer. Because, as we have held, the Final Offer did not affect any constitutionally protected interest, those claims also fail as a matter of law. As to the first of those claims, it founders under the principle succinctly stated in *McIntyre v. Bayer*, 339 F.3d 1097, 1099 (9th Cir. 2003)):

> In order to state a claim under the Takings Clause, a plaintiff must first establish that he possesses a constitutionally protected property interest.

And by the same token, the absence of any actionable constitutional violation negates by definition the existence of a conspiracy to violate constitutional rights (*Woodrum v. Woodward County*, 866 F.2d 1121, 1126 (9th Cir. 1989)).

In summary, we also affirm the district court's grant of summary judgment for Appellees on Association's Takings Clause and conspiracy claims that are premised on City's imposition of the 2005 Final Offer. And that means Association has struck out on all substantive aspects of its appeal.

### *Final Judgment as to Costs and Attorneys' Fees*

That leaves for consideration the parties' separate cross-appeals of the district court's final judgment as to costs and attorneys' fees. Association argues that the district court erred in finding that the Appellees were "prevailing parties" entitled to an award of costs—a finding of fact that we review for clear error (*Sablan v. Dep't of Fin.*, 856 F.2d 1317, 1324 (9th Cir. 1988)), although reversal is required if the district court applied incorrect legal standards to reach that finding (*Lummi Indian Tribe v. Oltman*, 720 F.2d 1124, 1125 (9th Cir. 1983)). For their part Appellees contend that although the district court was correct in finding that they were prevailing parties, the court erred (1) by summarily denying Appellees attorneys' fees without giving them an opportunity to set forth their arguments in a post-judgment motion and (2) by failing to announce its findings of fact and conclusions of law to explain its denial of an award of attorneys' fees.[11] In those

---

[11]Each of Association and Appellees argues that the other's appeal as to the award of costs should be deemed frivolous. But neither party submitted the motion required under Fed. R. App. P. 38. In the absence of such a separately filed motion, we cannot grant a party its attorneys' fees and costs in defending an appeal, notwithstanding the potential merit of any claim (*Higgins v. Vortex Fishing Sys., Inc.*, 379 F.3d 701, 709 (9th Cir. 2004)).

respects we review such denial for abuse of discretion (*Webb v. Ada County*, 195 F.3d 524, 526 (9th Cir. 1999)).

## 1.  Award of Costs

Rule 54(d)(1) provides that costs shall be allowed to the prevailing party unless a federal statute, the rules or a court directs otherwise. Courts consistently confirm that "[a] party in whose favor judgment is rendered is generally the prevailing party for purposes of awarding costs under Rule 54(d)" (*d'Hedouville v. Pioneer Hotel Co.*, 552 F.2d 886, 896 (9th Cir. 1977); accord, such cases as *Amarel v. Connell*, 102 F.3d 1494, 1523 (9th Cir. 1997)). Nor is it necessary for a party to prevail on all of its claims to be found the prevailing party (see, e.g., *K-2 Ski Co. v. Head Ski Co.*, 506 F.2d 471, 477 (9th Cir. 1974)).

Despite the district court's having granted summary judgment to Appellees on all of Association's federal claims, Association contends that *it* should be considered the prevailing party. To that end Association seeks to call into play the definition in *Farrar v. Hobby*, 506 U.S. 103, 111-12 (1992):

> In short, a plaintiff "prevails" when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.

*Farrar*, *id*. at 113 further explained that "[n]o material alteration of the legal relationship occurs until the plaintiff becomes entitled to enforce a judgment, consent decree, or settlement against the defendant."

Association seeks to emulate the alchemists in the Middle Ages in its effort to transmute the base metal of its total loss on the merits into the gold of "prevailing party" status by asserting that the district court's order materially altered its

relationship with Appellees. That assertion (1) points to the adverse finding that City's pickup amount was a salary element open to negotiation and (2) attempts to turn that into the possibility that Association could force Appellees to pay back wages and retirement benefits that had not been calculated because of the belief that City's pickup amount was not part of the employees' salaries.

That just won't work, and not just because any purported "prevailing party" status for Association is wholly counterintuitive. After all, Association has obtained no judgment, consent decree or settlement that it can enforce against Appellees —an express prerequisite to such status under *Farrar*. Its unproved and attenuated prospect of a better chance to assert a claim for the payment of wages and retirement benefits in some future case finds no support in the caselaw for "prevailing party" status in this case.

By obtaining summary judgment on all of Association's federal claims, and with no claims remaining against them in the district court, Appellees were clearly the prevailing parties in this federal action. As such, they were entitled to the award of costs as decreed by the district court.

## 2.  Denial of Attorneys' Fees

After the district court's extensive discussion of the award of costs to Appellees, it simply went on to say "[n]either party is entitled to recover its attorneys' fees." City and Individual Defendants appeal that denial of attorneys' fees, complaining that they were not given an opportunity to make a Rule 54(d)(2) motion and that the district court provided no explanation of its ruling. In response Association argues (1) that Appellees waived their right to challenge the district court's order by failing to make a Rule 54(d)(2) motion after the court's substantive judgment and (2) that no findings of fact and conclusions of law were mandated by Rule 54(d)(2)(C)

because the district court's determination was not made in response to a Rule 54(d)(2) motion.

It is of course true that it has been firmly established for nearly three decades that the award of attorneys' fees under Section 1988 emulates George Orwell's *Animal Farm*: "Some animals are more equal than others." In sharp contrast to the near-universal fee awards to prevailing Section 1983 plaintiffs, *Hughes v. Rowe*, 449 U.S. 5 (1980) (per curiam) adopted the same standard for Section 1988 awards that the seminal opinion in *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, (1978) had announced for a prevailing Title VII defendant: It "may recover attorney's fees from the plaintiff only if the District Court finds that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith" (*Hughes*, 449 U.S. at 14, quoting *Christiansburg Garment*, 434 U.S. at 421).

But the problem here is that we are left to speculate as to whether the unexplained denial of a fee award by the experienced district judge (formerly Chief Judge of her District Court) was predicated on an evaluation of Association's claims in those terms or on some other ground. Under the circumstances we cannot engage in an informed review of her decision.

Accordingly we remand the portion of the district court's order that denied Appellees an award of attorneys' fees. On remand the provisions of Rule 54(d)(2) shall apply.

### *Conclusion*

This has completed our review of all aspects of the district court's rulings. For the reasons we have set out in detail, we AFFIRM those rulings in all respects save that denying an award of attorneys' fees, which we REMAND for consideration by the district court in accordance with Rule 54(d)(2). Each party shall bear its own costs on appeal.

**AFFIRMED    IN    PART;    REVERSED    AND REMANDED IN PART.**